# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
Filed: September 2, 2025

```
*  *  *  *  *  *  *  *  *  *  *  *  *    *
MARTHA HONEYCUTT, Executrix           *
of ESTATE of RAYMOND CECIL            *
HONEYCUTT,                            *
                                      *
                 Petitioner,          *        No. 20-1410V
                                      *
v.                                    *        Special Master Young
                                      *
SECRETARY OF HEALTH                   *
AND HUMAN SERVICES,                   *
                                      *
                 Respondent.          *
*  *  *  *  *  *  *  *  *  *  *  *  *    *
```

*Braden Andrew Blumenstiel*, The Law Office of DuPont & Blumenstiel, Dublin, OH, for
Petitioner.
*Alexa Roggenkamp*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION ON ATTORNEYS' FEES AND COSTS[1]

       On June 18, 2024, Martha Honeycutt ("Petitioner") filed a motion for attorneys' fees and
costs, requesting **$50,693.00** for the work of her counsel. Pet'r's Mot., ECF No. 50. This amount
consists of $45,143.00 in fees and $5,550.00 in costs. *Id.* On August 1, 2024, Respondent filed his
response and objection to Petitioner's motion. Resp't's Response, ECF No. 52. In his response,
Respondent stated his opposition, asserting that because the "medical records provide no objective
basis for the injury alleged, this claim lacks a reasonable basis." *Id.* at 1. Petitioner filed a reply
brief on August 8, 2024. Pet'r's Reply, ECF No. 53. For the reasons stated below, I find that
Petitioner's claim had reasonable basis up until August 22, 2022, and she is therefore entitled to
fees and costs up to that time.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made
publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at
https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act
of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government
Services). This means the Decision will be available to anyone with access to the internet. In accordance
with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information,
the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that
the identified material fits within this definition, I will redact such material from public access.

## I.    Procedural History

The petition was filed on October 12, 2021, by Martha Honeycutt as executrix of the estate of Raymond Cecil Honeycutt, deceased ("Mr. Honeycutt"). Pet., ECF No. 1. The petition alleged that an influenza ("flu") vaccine administered to Mr. Honeycutt on October 17, 2018, "was a direct and proximate cause of [Mr. Honeycutt's] deteriorating condition and subsequent development of [Guillain-Barré Syndrome ("GBS")], which ultimately resulted in his death on January 27, 2019." *Id.* at 3.

On June 13, 2022, Respondent filed his Rule 4(c) report arguing against compensation. ECF No. 30. Respondent stated compensation should be denied because the preponderant evidence does not establish that Mr. Honeycutt suffered from GBS nor that his death was a sequela of his alleged GBS. *Id.* at 17. Respondent questioned whether there was a reasonable basis of Petitioner's claim. *Id.* at 21 n.6.

I held a status conference on November 15, 2022. Min. Entry, docketed Nov. 15, 2022. I subsequently ordered Petitioner file to a report from "a treater or an expert witness," addressing my "various concerns in this case." ECF No. 34 at 1. Specifically, the report was to address Mr. Honeycutt's pre-vaccination symptoms and whether his pre-vaccination symptoms were due to a cause separate from that of his post-vaccination symptoms; whether Mr. Honeycutt had GBS, as alleged; if so, whether it was more likely caused by his flu vaccine than by pneumonia; and the cause of Mr. Honeycutt's death. *Id.*

After two motions for extensions of time and two missed deadlines,[2] Petitioner filed a status report on August 22, 2023. ECF No. 40. The status report stated that Mr. Honeycutt's two treating physicians declined to submit reports. *Id.* at 1–2. She stated that she consulted another expert, who did not have availability to draft an expert report until September 2023. *Id.* at 2. Petitioner then stated that she "found an internist who has experience with [GBS] as well as working with this Court." *Id.* Petitioner noted that her counsel has "provided some case-related material to the expert[ and was] in the process of providing additional material the expert ha[d] requested." *Id.* Because Petitioner noted that an expert was reviewing her case, I allowed Petitioner until September 6, 2023, "to file a statement from her expert indicating that he or she has agreed to submit an expert report and noting an estimated completion date." ECF No. 41 at 2. I warned Petitioner that a failure to comply with this deadline would result in the issuance of an order to show cause. *Id.*

On September 6, 2023, Petitioner filed a status report and included an email exchange with her expert, Dr. Donald Marks. ECF No. 42. Petitioner's counsel emailed Dr. Marks on September 6, 2023, the date Petitioner's statement from her expert was due. *Id.* at 3. Petitioner's counsel asked Dr. Marks to "respond confirming you have agreed to review the case and provide a rough estimate as to when you believe you will have a preliminary opinion on the case." *Id.* Dr. Marks indicated that he was in the process of reviewing the case and "should have an initial opinion by [two] weeks from [September 6]." *Id.* On September 20, 2023, I issued an order striking this status report from

---

[2] Petitioner missed her March 6, 2023 expert report deadline and filed a motion for extension of time on March 7, 2023. ECF Nos. 34, 37. Petitioner then missed her May 8, 2023 expert report deadline, prompting my law clerk to contact counsel on June 14, 2023. Petitioner subsequently filed a motion for extension of time on June 23, 2023. ECF No. 38.

the record because the email exchange failed to confirm that Dr. Marks agreed to submit an expert report and, thus, did not comply with my August 23, 2023 Order. ECF No. 43 at 2.  I stated that Petitioner had "had 303 days to file a report from a treater or expert pursuant to my November 21, 2022 Order, ECF No. 32." *Id.*  I directed Petitioner to file the required statement from her expert by October 4, 2023, and I warned that an order to show cause would issue if Petitioner filed any statement from her expert without the required information. *Id.*  On October 4, 2023, Petitioner filed a letter signed by Dr. Marks, dated October 4, 2023. ECF No. 44-1. This letter was also non-compliant as it failed to include the required information as previously ordered. Accordingly, I issued an order to show cause on October 6, 2023. ECF No. 45. Petitioner was notified that her petition would be dismissed for failure to prosecute if she did not file an expert report by December 5, 2023. *Id.* at 3.

On December 5, 2023, Petitioner filed a "notice of intent to file Rule 21(B) stipulation of voluntary dismissal without prejudice." ECF No. 46. Petitioner wrote that she sought supporting opinions from three of Mr. Honeycutt's treating physicians; but "[u]nfortunately, they declined to provide Petitioner with supporting written opinions. Petitioner also sought the assistance of a retained expert, who reviewed all of the relevant medical records and determined he could not fully address all of this Court's concerns. As such, Petitioner [] authorized counsel to dismiss this claim." *Id.*  On December 6, 2023, Petitioner filed a joint stipulation of dismissal pursuant to Vaccine Rule 21(a). ECF No. 47. I issued an order concluding proceedings on December 29, 2023. ECF No. 49.

On June 18, 2024, Petitioner filed a motion for attorneys' fees and costs. Pet'r's Mot. Respondent filed a response objecting to Petitioner's motion on August 1, 2024. Resp't's Response. Petitioner filed a reply on August 8, 2024. Pet'r's Reply. This matter is now ripe for consideration.

## II.    Relevant Medical History

Mr. Honeycutt was 76 years old when he received a flu vaccine on October 17, 2018. Pet'r's Ex. 3 at 5. Prior to vaccination, Mr. Honeycutt suffered from several chronic conditions, including chronic obstructive pulmonary disease, coronary artery disease requiring bypass surgery, and spinal degenerative disc disease. *See generally id.* On October 12, 2018, five days prior to the subject flu vaccination, Mr. Honeycutt saw his primary care provider ("PCP") for back pain that he rated 8/10. *Id.* at 3. His PCP felt Mr. Honeycutt's pain was from degenerative lumbar disc disease. *Id.* He did not perform a neurologic examination. *Id.* Petitioner received Kenalog and Toradol injections for his pain. *Id.*

On October 17, 2018, Mr. Honeycutt returned to his PCP complaining of ongoing back pain that "severely flared up about [two] weeks ago while working on his roof." Pet'r's Ex. 3 at 7. His PCP noted that Mr. Honeycutt appeared "[f]rail." *Id.* "Hyporeflexia bilat[eral] in patellar reflexes" was noted on neurologic examination. *Id.* His PCP administered a steroid injection, prescribed hydrocodone, and ordered a spinal MRI. *Id.* Mr. Honeycutt received the subject flu vaccination at this visit. *Id.*

On November 5, 2018, approximately three weeks after vaccination, Mr. Honeycutt saw his PCP to review his MRI, which revealed "multilevel severe" degenerative disc disease "with facet hypertrophy and spinal stenosis." Pet'r's Ex. 4 at 3. Mr. Honeycutt reported chills, a productive cough, and shortness of breath. *Id.* No neurologic examination was performed. *Id.* His PCP administered a vitamin B12 shot. *Id.*

On November 13, 2018, Mr. Honeycutt returned to his PCP for "severe" fatigue that began one month prior, with cough, sneezing, and a sore throat. Pet'r's Ex. 32 at 3. No neurologic examination was performed. *Id.* His PCP prescribed an iron supplement and Zithromax. *Id.*

Forty-four days after his flu vaccination, on December 1, 2018, Mr. Honeycutt presented to the emergency department ("ED") at Lake Cumberland Regional Hospital ("LCRH") for a three-day history of left arm pain and tingling and generalized weakness. Pet'r's Ex. 7 at 70. He was concerned he was having a heart attack. *Id.* at 31. On examination, Mr. Honeycutt had full range of motion of his extremities and had a "[n]on-focal" neurologic examination. *Id.* at 34. The impression was paresthesia of left upper extremity as well as anxiety, hypertension, and coronary artery disease. *Id.* at 37.  He was discharged and instructed to follow up with his PCP and cardiologist. *Id.*

On December 18, 2019, approximately nine weeks after vaccination, Mr. Honeycutt presented to the University of Kentucky Medical Center "UKMC" ED for neck and back pain following a fall that occurred when his "knees gave out." Pet'r's Ex. 6 at 1. He was "having difficulty urinating" and was constipated. *Id.* He reported that prior to the fall, he had "limited mobility in his legs and ha[d] numbness in all [of] his extremities down to his toes and his hands." *Id.* He stated he was "so weak" and vomited the day prior. *Id.* On examination, he had full lower and upper strength bilaterally,[3] abnormal reflexes in his feet, and normal sensation in his arms. *Id.* at 2. A spinal MRI revealed degenerative changes only and "bilateral lung consolidations," "concerning for aspiration and/or pneumonia." *Id.* at 15–17. He had an elevated white blood cell count suggestive of a possible underlying infectious process. *Id.* at 2. Mr. Honeycutt was admitted to the hospital with diagnoses of "[a]cute hypoxic respiratory failure and sepsis with community-acquired pneumonia," and back pain. *Id.* at 3. He was started on antibiotics. *Id.*

On admission to UKMC, Mr. Honeycutt reported a decreased appetite and a twenty-pound weight loss over the prior six months. Pet'r's Ex. 6 at 24. It was also noted that approximately two to three months prior, he received two steroid shots in his back and a flu shot. *Id.* His upper and lower extremity paresthesias were "much improved" from when he first presented to the ED, and he had "[n]o gross neurological deficits." *Id.* at 24, 26. He was diagnosed with sepsis from community-acquired pneumonia, hypoxic respiratory failure, a recent fall with back pain, anemia of chronic disease, constipation "likely complicated by acute back pain and narcotic use," and urinary retention likely secondary to constipation. *Id.* at 30–31. A sputum culture showed a light growth of methicillin-resistant Staph Aureus ("MRSA"), and a

---

[3] In the extremities examination it was noted Petitioner had "[r]educed strength in bilateral lower extremities" but in the neurologic examination it was noted that Petitioner had "5/strength bilateral lower extremity with sensation intact." Pet'r's Ex. 6 at 2.

nasal swab PCR test was positive for MRSA. *Id.* at 38–39. Imaging of his chest on December 24, 2018, was consistent with progressive infection or aspiration, and labs from December 26, 2018, showed an elevated white blood cell count. *Id.* at 46–47, 52, 54–55.

Mr. Honeycutt was discharged from UKMC on December 27, 2018, with diagnoses of pneumonia, acute delirium, MRSA pneumonia, "[m]oderate protein-energy malnutrition," and "[w]eakness of lower extremity." Pet'r's Ex. 6 at 58. He had been evaluated by orthopedics "because of bilateral lower extremities radiculopathies" with a recommendation "to continue with conservative management." *Id.* The discharge examination showed equal strength and sensation bilaterally and "[n]o gross neurological deficits." *Id.* at 59. Mr. Honeycutt was instructed to follow up with his PCP, the pulmonary clinic, and the orthopedic clinic. *Id.* at 60.

On January 2, 2019, Mr. Honeycutt presented to the LCRH ED for respiratory issues. Pet'r's Ex. 37 at 196. A neurological examination was "[n]on-focal." *Id.* at 208. His labs showed elevated white blood cell count and were positive for influenza B. *Id.* at 177–78, 209. A chest x-ray showed pneumonia. *Id.* at 221. Mr. Honeycutt was admitted with a diagnosis of "healthcare-associated pneumonia." *Id.* at 210. The admission history noted Mr. Honeycutt had "[b]een weak," could not stand, and had more shortness of breath. *Id.* at 188. His recent ICU admission "for MRSA pneumonia" was noted and that his condition had been worsening since discharge. *Id.* His wife stated Mr. Honeycutt needed maximum assistance to walk and could not bathe himself or do other activities of daily living. *Id.* On examination, he was "chronically ill-appearing," had "diffuse rhonchi throughout both lungs," "no focal deficits," and cranial nerves two through 12 were grossly intact. *Id.* at 189. The admitting assessment was that Mr. Honeycutt was "recently discharged from [UKMC] after ICU admission for MRSA pneumonia [and] present[ed] for worsening dyspnea on exertion, cough[,] and weakness." *Id.* An attending physician wrote that Mr. Honeycutt had been "recently hospitalized and discharged [five] days ago in Lexington at [UKMC and was] diagnosed with possible [GBS] after receiving a flu shot, [and] also MRSA pneumonia." *Id.* at 191. The attending physician also noted Mr. Honeycutt had "[l]oss of reflexes" to the lower extremities bilaterally. *Id.* He was treated with broad spectrum antibiotics for pneumonia and Tamiflu for influenza. Pet'r's Ex. 33 at 177. He was not tested or treated for GBS.

Mr. Honeycutt reported feeling better on January 4, 2019. Pet'r's Ex. 37 at 173. Examination revealed normal upper and lower extremity strength and cranial nerves two through 12 were grossly intact. *Id.* at 179. He was able to get up and ambulate. Pet'r's Ex. 33 at 155. On January 7, 2019, an attending physician wrote that Mr. Honeycutt was recently discharged from UKMC with "MRSA pneumonia and possible GBS." *Id.* at 148. Later that day, Mr. Honeycutt saw a urologist for urinary retention and was diagnosed with persistent urinary retention, "[o]verall debility," and pneumonia. Pet'r's Ex. 37 at 181. The urologist felt that Mr. Honeycutt would not be able to void spontaneously until he improved his overall strength and activities of daily living. *Id.* Mr. Honeycutt was discharged on January 8, 2019, with diagnoses of "[s]epsis secondary to pneumonia, likely MRSA, with acute on subacute hypoxic respiratory insufficiency," benign prostatic hyperplasia, constipation, and resolved influenza B infection. *Id.* at 184. He had no focal deficits and no focal weakness or loss of muscle tone. *Id.* at 185.

On January 14, 2019, Mr. Honeycutt returned to the ED at LCRH for respiratory distress. Pet. Ex. 34 at 61. A chest x-ray showed worsening pneumonia and labs showed an elevated white blood cell count. *Id.* He was admitted to the ICU with a primary impression of "healthcare-associated pneumonia" and acute respiratory insufficiency. *Id.* at 62. The admitting physician noted that Mr. Honeycutt "recently had [two] hospitalizations [] in the past month." Pet'r's Ex. 8 at 190. The physician documented that Mr. Honeycutt had also "been experiencing progressive lower extremity weakness that began after receiving a flu shot" and noted the "[f]amily's concern for [GBS]," but that they "refused [a] lumbar puncture." *Id.* On examination, Mr. Honeycutt had 4/5 upper extremity strength, 2-3/5 lower extremity strength, and normal cranial nerve function. *Id.* at 192. His deep tendon reflexes were not tested. Mr. Honeycutt was diagnosed with "sepsis secondary to pneumonia," and started on antibiotics. *Id.* The physician noted differential diagnoses of GBS, ALS, vitamin B12 deficiency, hypothyroidism, and other nutritional deficiencies, and noted they would "consider a lumbar puncture if patient [was] willing." *Id.* at 193.

An inpatient progress note written on January 14, 2019, noted that Mr. Honeycutt had been seen "in the [UKMC] where there was a concern for [GBS]." Pet'r's Ex. 8 at 177. On examination, Mr. Honeycutt had no neurological deficits. *Id.* at 178. That same day, Mr. Honeycutt saw a pulmonologist for his "[p]ersistent bilateral pneumonia." Pet'r's Ex. 8 at 180. On examination, Mr. Honeycutt appeared "chronically ill," had a rapid respiratory rate, rhonchi, decreased breath sounds, no focal muscle weakness or decreased muscle tone, was able to move all extremities, and had no focal neurological deficits. *Id.* at 183. He was diagnosed with acute hypoxic respiratory insufficiency and leukocytosis. *Id.* at 184. On January 17, 2019, an attending physician opined that Mr. Honeycutt's bilateral lower extremity weakness was "likely multifactorial," secondary to "hypothyroidism and critical care myopathy." *Id.* at 135. The record repeats the same note regarding a differential diagnosis of GBS and ALS with consideration for lumbar puncture. *Id.* at 57, 135. On January 19, 2019, Mr. Honeycutt was "moved to the ICU for tachypnea and worsening pulmonary function." *Id.* at 96.

On January 24, 2019, Mr. Honeycutt was discharged to a skilled nursing facility with transfer diagnoses of pneumonia, hypoxic respiratory insufficiency, functional quadriplegia "believed to be multifactorial secondary to critical illness myopathy as well as primary hyperthyroidism," and paroxysmal atrial fibrillation. Pet'r's Ex. 8 at 185. His "lower extremity weakness" was "believed to be multifactorial in nature secondary to critical illness myopathy and hypothyroidism." *Id.* at 186. GBS, ALS and Huntington's disease were considered "unlikely" due to "improvement with treatment of [his] acute conditions." *Id.* The skilled nursing facility admission note stated that Mr. Honeycutt "[thought] he developed GBS" after receiving flu vaccine. Pet'r's Ex. 9 at 10.

On January 27, 2019, Mr. Honeycutt was transported to the ED from the nursing facility by ambulance for severe respiratory distress. Pet'r's Ex. 35 at 22. He arrived at the ED having been intubated by EMS. *Id.* The triage note stated that he "was admitted into Signature Health Care [three] days ago with [GBS] and pneumonia." *Id.* The ED physician noted that Mr. Honeycutt's history was reported by his family,[4] who stated that he had pneumonia and GBS. *Id.*

---

[4] The triage note stated history was provided by the nursing facility. Pet'r's Ex. 35 at 22.

at 24. Mr. Honeycutt was pronounced dead shortly after arrival at the hospital due to respiratory arrest. *Id.* at 27. His death certificate lists the causes of death as cardiopulmonary arrest, GBS, and pneumonia. Pet'r's Ex. 11 at 1.

### III.    Affidavits

### a.  Mr. Honeycutt's Wife (Petitioner)

Petitioner executed an affidavit in October of 2020. Pet'r's Ex. 1. She stated she is the widow of Mr. Honeycutt. *Id.* at ¶ 3. She asserted Mr. Honeycutt was in "relatively decent health for a man his age" prior to October 17, 2018. *Id.* at ¶ 5. On October 17, 2018, Petitioner asserted Mr. Honeycutt received a flu vaccine, which resulted in the development of GBS and "ultimately lead to his death." *Id.* at ¶ 7. She recalled that within days of receiving the vaccine, Mr. Honeycutt "developed lower body weakness, nausea[,] and neck stiffness." *Id.* at ¶ 10. Less than two weeks after the vaccination, he "became plagued with debilitating conditions, such as hypoxia, extreme fatigue, hypersensitivity to touch, neck pain and stiffness, and eventual paralysis, that soon resulted in a diagnosis of [GBS]." *Id.* at ¶ 11. Petitioner briefly described his worsening progression and the dates of his hospitalizations. *Id.* at ¶¶ 13–15. She noted that the "debilitating symptoms associated with this disorder" ("numbness, tingling, weakness, compressed reflexes, sensitivity to light, inability to walk[] or climb stairs, abnormal sensations and pain of the upper body, [and] loss of bowel and bladder functions") resulted in the "rapid decline of his health." *Id.* at ¶ 17. Petitioner asserted, Mr. Honeycutt "never recovered and he passed away on January 27, 2019[,] due to complications from the vaccine he received on October 17, 2018." *Id.* at ¶ 16.

### b.  Mr. Honeycutt's Daughter

Mary Bryant, Mr. Honeycutt's daughter and registered nurse, executed an affidavit in August of 2020. Pet'r's Ex. 10 at ¶ 3. Ms. Bryant stated that prior to October 17, 2018, her father was a "physically active, well-oriented 76-year old" and "did not require assistance in his life in any form." *Id.* at ¶¶ 4–5.

Following the vaccine, Ms. Bryant "witnessed [her] father decline rapidly." Pet'r's Ex. 10 at ¶ 6. She recalled that on Thanksgiving Day, November 22, 2018, her father "was beginning to get very weak." *Id.*

> [She] noticed that he had a very hard time walking to the dinner table when it was time to eat. [She] inquired to him, "Dad, tell me what symptoms you're experiencing. Do you think you did something to your back?" He replied, "No, it feels like I have concrete blocks on my feet, I'm having a hard time walking."

*Id.* After that response, Ms. Bryant instructed her mother (Petitioner) to get him back to his family doctor to try to get him referred to a neurologist as soon as possible. *Id.* "The day [her] mom took dad back to his family doctor[,] they had to wheelchair him in. He could not walk even just a few feet." *Id.*

At this point, Ms. Bryant noted her father "began declining very rapidly." Pet'r's Ex. 10 at ¶ 6. Between the dates of October 17, 2018 and January 27, 2018 she watched him "become a shadow of himself." *Id.*

> He became completely bed bound. [Ms. Bryant] routinely had to turn him because he could not accomplish this on his own anymore. He had to be catheterized because he could not urinate on his own. He also had to be given enemas to have a bowel movement as this bodily function seemed to be affected as well. A couple of weeks before his passing, he could not even hold a cup, or feed himself, so he had to be assisted with this too. His hands just stopped working. He ended up being [] [oxygen] dependent and had to be suctioned often. It was like he could not even swallow anymore at this point. Near the very end he stated to [her], "I can't even see anymore." It all began with his feet and by the time of his death, even his vision was taken from him.

*Id.*

In December of 2018, Ms. Bryant recalled her father was admitted to UKMC. Pet'r's Ex. 10 at ¶ 7. She recalled the following interaction:

> The assigned pulmonologist came to evaluate dad and asked if he had a flu shot recently. Dad weakly replied, "Yes, not long ago." He had received the flu vaccination in October. The pulmonologist then stated that dad had all the classic symptoms of [GBS]. [Ms. Bryant] then asked the pulmonologist to elaborate on the condition, telling him, "Forgive me, but I work as a nurse on the cardiac unit, so I am not familiar with this diagnosis of GBS." He then explained that it is a neurological disease that begins at the feet and travels up affecting the whole body and that GBS can sometimes happen after receiving the flu vaccination.

*Id.* She concluded, "[c]oming from a clinical standpoint of a nurse, seeing the symptoms [her] dad presented, [she] fully believed that [GBS] cut his life short." *Id.*

## IV.    Reasonable Basis Determination

### a.    Standards of Review

To obtain attorneys' fees pursuant to a Vaccine Act claim, the petitioner must have a reasonable basis to support all elements of the claim for which the petition is brought, including causation. *Cottingham ex rel. K.C. v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337, 1345–46 (Fed. Cir. 2020) (citing 42 U.S.C. §§ 300aa11(c)(1), 300aa–15(e)(1)). An analysis of reasonable basis requires more than just a petitioner's belief in her claim. *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *6–7 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). While the statute does not define the quantum of proof needed to establish reasonable basis, it is "something less than the preponderant evidence ultimately required to prevail on one's vaccine-injury claim." *Chuisano v. Sec'y of Health & Hum. Servs.*, 116 Fed. Cl. 276, 283 (2014). The Federal Circuit has affirmed that "more than a mere scintilla but less than a preponderance of proof could provide

sufficient grounds for a special master to find reasonable basis." *Cottingham*, 971 F.3d at 1346 (finding Petitioner submitted objective evidence supporting causation when she submitted medical records and a vaccine package insert and clarifying that "the failure to consider objective evidence presented in support of a reasonable basis for a claim would constitute an abuse of discretion"). Indeed, determining what constitutes "more than a mere scintilla" is a "daunting task." *Cottingham v. Sec'y of Health & Hum. Servs.*, No. 15-1291V, 2021 WL 3085502, at *13 (Fed. Cl. Spec. Mstr. July 21, 2021).

While the Court in *Cottingham* did not purport to identify all forms of objective evidence reflective of reasonable basis, it stated that "objective medical evidence, including medical records . . . even where the records provide only circumstantial evidence of causation" can support a showing of reasonable basis. *Cottingham,* 971 F.3d at 1346 (citing *Harding v. Sec'y of Health & Hum. Servs.,* 146 Fed. Cl. 381, 403 (2019)). The *Cottingham* Court also reiterated that the reasonable basis determination is still based on a "totality of the circumstances." *Cottingham,* 971 F.3d at 1346.

In another recent opinion regarding reasonable basis, the Federal Circuit stated that medical records, affidavits, and sworn testimony all constitute objective evidence to support reasonable basis. *James-Cornelius v. Sec'y of Health & Hum. Servs.,* 984 F.3d 1374, 1379–81 (Fed. Cir. 2021). The Circuit further clarified that "absence of an express medical opinion on causation is not necessarily dispositive of whether a claim has reasonable basis." *Id.* at 1379 (citing *Cottingham*, 971 F.3d at 1346). When determining if a reasonable basis exists, many special masters and judges consider a myriad of factors. The factors to be considered may include "the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Hum. Servs.,* 138 Fed. Cl. 282, 289 (2018). This approach allows the special master to look at each application for attorneys' fees and costs on a case-by-case basis. *Hamrick v. Sec'y of Health & Hum. Servs.,* No. 99-683V, 2007 WL 4793152, at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).

Additionally, there may be reasonable basis at the time that a claim is filed, which then dissipates as the claim proceeds. *R.K. v. Sec'y of Health & Hum. Servs.,* 760 F. App'x 1010, 1012 (Fed. Cir. 2019) (citing *Perreira v. Sec'y of Health & Hum. Servs.,* 33 F.3d 1375, 1376–77 (Fed. Cir. 1994) holding that "an award of fees and costs was not authorized for work performed on a case after a claim lost its reasonable basis"). If reasonable basis is lost, "[p]etitioners' counsels have an obligation to voluntarily dismiss a Vaccine Act claim once counsel knows or should know a claim cannot be proven." *Cottingham v. Sec'y of Health & Hum. Servs.,* 134 Fed. Cl. 567, 574 (2017) (citing *Perreira*, 33 F.3d at 1376; *Curran v. Sec'y of Health & Hum. Servs.,* 130 Fed. Cl. 1, 6 (2017); *Allicock v. Sec'y of Health & Hum. Servs.,* 128 Fed. Cl. 724, 727 (2016)).

### b. Parties' Arguments

#### 1. Petitioner

Petitioner asserted that she had a reasonable basis to file this claim based on medical records, affidavits, and the flu vaccine package insert—which support a diagnosis of GBS, the injury alleged.

First, Petitioner listed medical records documenting Mr. Honeycutt's symptoms "which match the symptoms commonly experienced by people with GBS." Pet'r's Reply at 7; *see also* Pet'r's Mot. at 9. For example, "reduced strength in bilateral extremity weakness." Pet'r's Reply at 7 (quoting Pet'r's Ex. 6 at 2). She also cited the medical records where GBS was listed as a "possible" diagnosis or as a differential diagnosis. *See id.* Petitioner relied heavily on the admitting diagnosis of GBS at the skilled nursing facility and the death certificate listing GBS as one of the causes of death, as more than a scintilla of evidence that Mr. Honeycutt had GBS. Thus, according to Petitioner, "there is significant evidence that Mr. Honeycutt's own medical providers and the coroner believed he was suffering from GBS." *Id.* at 8.

Second, Petitioner argued that the sworn affidavits from Ms. Honeycutt declared that Mr. Honeycutt began to experience symptoms within two weeks of the flu vaccine. Pet'r's Mot. at 7–8. In the motion, Petitioner did not describe what those symptoms were.[5] In her reply, Petitioner noted the symptoms included lower body weakness, nausea, neck stiffness, extreme fatigue, and hypersensitivity to touch. Pet'r's Reply at 7.

Third, Petitioner asserted that there is a "well known and established connection between the flu vaccine and GBS." Pet'r's Mot. at 8. With her reply brief, Petitioner included the Fluarix vaccine package insert in which Petitioner's "symptoms are identified as common adverse reactions" and are symptoms of GBS. Pet'r's Reply at 2, 7.

Therefore, according to Petitioner, given the totality of the circumstances and specifically "[t]he fact there is an admitting diagnosis of GBS and the death certificate states GBS was a cause of Mr. Honeycutt's death[,] [] [P]etitioner had a reasonable basis to pursue this claim[6] and attorney's fees and expenses should be awarded." Pet'r's Reply at 3, 8.

## 2. Respondent

Respondent stated his opposition to Petitioner's motion, asserting this claim lacks a reasonable basis because "Mr. Honeycutt's medical records do not provide more than a scintilla of evidence that he had GBS, the injury alleged," "which is a critical threshold element of [P]etitioner's case." Resp't's Response at 14, 18. His review of the medical history highlighted the lack of a GBS diagnosis and lack of neurological symptoms that would be consistent with a GBS diagnosis. *See id.* at 4–10. He also noted that Petitioner "severely distorts and omits essential facts" in the medical history of her motion in asserting a reasonable basis. *Id.* at 14–16. For example, the "focus of Mr. Honeycutt's treatment throughout his course was his pneumonia-induced respiratory distress" and that was disregarded in Petitioner's description of Mr. Honeycutt's clinical course.

---

[5] Earlier in Petitioner's motion she stated that "[w]ithin that two weeks of receiving the flu vaccine on October 17, 20[1]8, Mr. Honeycutt began to experience ascending paralysis, severe fatigue, numbness and tingling of his extremities, sensory abnormalities, and vision problems." Pet'r's Mot. at 6 (citing Pet'r's Ex. 38 at 21). However, the medical record cited is from October 17, 2018, the day he received the flu vaccine, not two weeks after.

[6] Petitioner noted that "[o]nce it became clear that [P]etitioner could not obtain supporting reports from a treating physician or a retained expert, [P]etitioner filed Stipulations to Dismiss the case on December 6, 2023." Pet'r's Reply at 8.

*Id.* at 14. Further, he claimed Petitioner's assertion that it was determined Mr. Honeycutt had GBS on January 14, 2019, "is objectively false," as it is merely a differential diagnosis that is "repeated throughout the record without endorsement from any specific provider." *Id.* at 15 (citing Pet'r's Mot. at 7).

Respondent disagreed with Petitioner's reliance on the admitting diagnosis to the skilled nursing facility as evidence of a GBS diagnosis. Resp't's Response at 16. It was unclear to Respondent "why the paperwork at the skilled nursing facility listed GBS as the primary admitting diagnosis when that is at odds with the entirety of Mr. Honeycutt's medical records, including the discharge paperwork created by the hospital from which he was transferred." *Id.* As to Petitioner's reliance on Mr. Honeycutt's death certificate as evidence of GBS, Respondent stated it is not supported by the medical records. Respondent argued the only reason GBS appeared on the death certificate was because "Mr. Honeycutt's family erroneously reported a prior diagnosis of GBS from his UKMC hospitalization." *Id.* (citing Pet'r's Ex. 35 at 24).

In short, Respondent argued any mention of GBS in the medical records is due to Mr. Honeycutt's family self-reporting such and "[i]t is completely at odds with the overwhelming medical record evidence to assert that Mr. Honeycutt was diagnosed with GBS. Not a scintilla of evidence exists to support that diagnosis." Resp't's Response at 16.

Respondent challenged the reasonable basis of Petitioner's claim from the time it was filed through her application for fees. Alternatively, Respondent challenged reasonable basis of Petitioner's claim from the time it was filed up to April 12, 2022, when "[c]ounsel's billing records document their knowledge that a GBS diagnosis did not appear in Mr. Honeycutt's records." Resp't's Response at 17 (emphasis omitted). Respondent noted that on April 12, 2022, two months before Respondent filed his Rule 4(c) report,[7] Petitioner's counsel entered a billing entry for: "Conversations with Martha and Mary regarding confirmation of GBS diagnosis. Death certificate is only direct reference to GBS." *Id.* (quoting Pet'r's Mot. at 29). Respondent argued that Petitioner should have realized here that she did not have a reasonable basis to proceed with her claim because there was not more than a scintilla of evidence that Mr. Honeycutt had GBS. *Id.*

But Petitioner continued with her claim and on November 28, 2023, Petitioner's counsel further documented: "Phone conference with client, sister, and mother. Explained that lack of formal diagnosis of GBS and lack of GBS testing led expert to say he cannot prove the claim." Resp't's Response at 17 (quoting Pet'r's Mot. at 36). The next billing entry stated:

> P[h]one conference with Sherry and Mary regarding the need to find GBS [diagnosis] in the medical records and to find a treating physician who diagnosed the GBS. They said the pulmonologist Parijet Sen gave the [diagnosis]. [Counsel] reviewed the UKMC records but could not find where Dr. Sen gave a firm [diagnosis] of GBS."

---

[7] Respondent also questioned reasonable basis in his Rule 4(c) report. ECF No. 30 at 21 n.6.

*Id.* (quoting Pet'r's Mot. at 36). Therefore, Respondent contended that "[P]etitioner clearly knew, or should have known through due diligence, that no such GBS diagnosis appeared in the record, and that [P]etitioner's claim therefore lacked reasonable basis." *Id.* at 17–18.

## V.    Reasonable Basis Analysis

After careful review of the record,[8] I find that Petitioner has satisfied the reasonable basis requirements when the claim was filed on October 12, 2021, because there is more than a scintilla of objective evidence in the record supporting a feasible claim. However, I find reasonable basis was lost on or about August 22, 2022.

Here, Respondent's objection to reasonable basis is that Petitioner's claim is not supported by evidence that demonstrates he sustained the injury alleged, GBS. "However, it is not necessary for petitioner to substantiate the entirety of her allegations in order to have had a reasonable basis for the filing of her petition." *H.D. v. Sec'y of Health & Hum. Servs.*, No. 19-871V, 2024 WL 2034219, at *5 (Fed. Cl. Spec. Mstr. Apr. 8, 2024)

Prior to the vaccination at issue, Mr. Honeycutt had several well-managed chronic conditions. According to the medical records and affidavits, he did not need assistance with activities of daily living prior to the vaccination. On October 17, 2018, Mr. Honeycutt received the subject flu vaccination. Petitioner swore that within days of receiving the vaccine, Mr. Honeycutt "developed lower body weakness, nausea[,] and neck stiffness." Pet'r's Ex. 1 at ¶ 10. Mr. Honeycutt's daughter similarly attested that on Thanksgiving Day, approximately one month post vaccination, her father was very weak. She recalled her father telling her he felt like he had "concrete blocks on [his] feet" and was "having a hard time walking." Pet'r's Ex. 10 at ¶ 6. Mr. Honeycutt's daughter also attested that in December 2018 a pulmonologist stated her father had all the classic symptoms of GBS and explained to them that GBS can sometimes happen after receiving the flu vaccination. This particular statement is not supported by the medical records.

The medical records provide that Mr. Honeycutt presented to the ED on December 18, 2019, after falling because his "knees gave out." Pet'r's Ex. 6 at 1. He was "having difficulty urinating" and was constipated. *Id.* He reported that prior to the fall, he had "limited mobility in his legs and ha[d] numbness in all [of] his extremities down to his toes and his hands." *Id.* In the extremities examination it was noted Petitioner had "[r]educed strength in bilateral lower extremities" but in the neurologic examination it was noted that Petitioner had "5/strength bilateral lower extremity with sensation intact." *Id.* at 2. On admission, it was noted he received a flu shot two to three months prior. The primary discharge diagnoses included pneumonia and lower extremity weakness. Mr. Honeycutt was admitted to the hospital again on January 2, 2019

---

[8] While I have reviewed all of the information filed in this case, only those filings and records that are most relevant to the decision will be discussed. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

for pneumonia. Admission notes state Mr. Honeycut was weak, could not stand, and needed his wife's assistance for activities of daily living. While no focal deficits were observed, an attending physician wrote that Mr. Honeycutt had been "recently hospitalized and discharged [five] days ago . . . [and was] diagnosed with possible [GBS] after receiving a flu shot, [and] also MRSA pneumonia." Pet'r's Ex. 7 at 191. From this day on, GBS is noted as a possible diagnosis or as a differential diagnosis. A later January 2019 ED encounter noted that Mr. Honeycutt had "been experiencing progressive lower extremity weakness that began after receiving a flu shot." Pet'r's Ex. 8 at 190. Thus while Mr. Honeycutt's primary concerns revolved around his pneumonia, GBS and its relation to the flu vaccine is noted throughout the record by multiple physicians. And one of the causes of death on the death certificate is GBS.

While some of the medical records seem contradictory, have clear shortcomings, and do not preponderantly support Petitioner's claim, they do, at a minimum, present more than a mere scintilla of evidence supporting general vaccine causation with respect to Petitioner's complaints. The lack of explicit or implicit statements of vaccine causation and diagnosis made by a treating medical professional, in the absence of an expert report regarding the *Althen* prongs, certainly undercuts the veracity of her claim. However, a motion for fees and costs is not subject to the same standard as entitlement. Petitioner needs only to submit "more than a mere scintilla" of objective evidence in support of her claim. *James-Cornelius*, 984 F.3d at 1379. In fact, the Federal Circuit has specifically held that "[m]edical records can support causation [for reasonable basis] even where the records provide only circumstantial evidence of causation" for entitlement. *Cottingham*, 971 F.3d at 1346.

Petitioner also provided the vaccine package insert as evidence. Ultimately, consideration of the entire record reveals the type of evidence the Federal Circuit identified for reasonable basis in *Cottingham*. *Cottingham*, 971 F.3d at 1346 (finding that Petitioner's "medical records paired with the [vaccine's] package insert [] constitute at minimum circumstantial, objective evidence supporting causation," when the alleged symptoms match those specifically detailed in the packaging). The Federal Circuit was clear that reasonable basis may be evaluated case by case, and they recently reiterated that an "objective, totality of the circumstances test comports with [their] jurisprudence, [although] it is not required." *Sheller v. Sec'y of Health & Hum. Servs.*, 121 F.4th 1301, 1306 (Fed. Cir. 2024) (citing *Cottingham*, 971 F.3d at 1346).

It is in consideration of all of these facts and circumstances that I find that Petitioner's claim had a reasonable basis at the time of filing, and she is therefore entitled to attorneys' fees and costs. However, I find reasonable basis was lost during the course of litigation. The petition was filed on October 12, 2021. Six months later, on April 12, 2022, Petitioner's counsel entered a billing entry for: "Conversations with Martha and Mary regarding confirmation of GBS diagnosis. Death certificate is only direct reference to GBS." Pet'r's Mot. at 29. Instead of recognizing the weakness in her case immediately, Petitioner chose to continue litigation for an additional 20 months, until December 2023. During these months, Petitioner attempted to retain experts. Petitioner's subsequent billing records in November 2023 further reflect the knowledge of a lack of GBS diagnosis. And in December 2023, Petitioner's counsel entered a billing entry for: "Had phone conference with Sherry explaining . . . that we have to dismiss the case because we don't have a reasonable basis to continue since we don't have a medical expert supporting the case." Pet'r's Mot. at 37. While it is true that the lack of a medical expert undercuts the

reasonable basis of a claim, reasonable basis can cease to exist prior to any attempts of obtaining an expert. A reasoned analysis of the evidence in this case should have led an experienced attorney to dismissal in a timely manner prior to attempting to obtain an expert.

Petitioner's counsel took on the case almost two years prior to filing the petition. Billing records indicate he spent ample time reviewing the medical records. While in hindsight it is evident there is no confirmed diagnosis of GBS, as stated above, I find there was more than a scintilla of evidence for reasonable basis based on the few notations of GBS and possible vaccine causation in the medical records. However, by April 12, 2022, Petitioner's counsel acknowledged the only direct reference to GBS was the death certificate. At this time, Petitioner knew or should have known that there was no GBS diagnosis and therefore the claim lacked reasonable basis. Two months later, on June 13, 2022, Respondent's Rule 4(c) report confirmed Petitioner's suspicion by noting reasonable basis was questionable on the grounds that the medical records did not support a GBS diagnosis. Counsel's billing records indicate the paralegal reviewed the Rule 4(c) report in June 2022, and counsel reviewed it August 2022 to "determine strategy for proceeding." Pet'r's Mot. at 30.

In arguing she had a reasonable basis, Petitioner stated that she sought to obtain an expert report, although she was ultimately unable to. Petitioner pursued her desire to continue litigation, despite her knowledge of no GBS diagnosis, Respondent's written objections in his Rule 4(c) report,[9] and my voiced concerns during the November 2022 status conference. It was Petitioner's choice to continue despite clear knowledge that counsel risked not being compensated for a lack of reasonable basis moving forward.

I find reasonable basis existed up until August 22, 2022. Petitioner will not be awarded any fees after this point, besides preparing the stipulation of dismissal and preparing the motion for attorneys' fees.[10] This results in a reduction of $28,370.00. While obtaining an expert occurred after August 22, 2022, as explained below, I will award the cost associated with expert's retainer fee but not counsel's fees for time spent retaining or communicating with the expert.

## VI.     Reasonable Attorneys' Fees and Costs

The Federal Circuit has approved the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. *Avera v. Sec'y of Health & Hum. Servs.*, 515 F.3d 1343, 1348 (Fed. Cir. 2008). This is a two-step process. *Id.* First, a court determines an "initial estimate . . . by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Id.* at 1347–48 (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings. *Id.* at 1348.

---

[9] The billing records reflect Petitioner's counsel spent time determining how to proceed considering the Rule 4(c) report. Pet'r's Mot. at 30.

[10] All reductions made below will be applied up to and including August 22, 2022, as well as the 2.4 hours spent filing the stipulation of dismissal and preparing the subject motion.

A special master need not engage in a line-by-line analysis of Petitioner's fee application when reducing fees. *Broekelschen v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 719, 729 (2011). It is "well within the special master's discretion" to determine the reasonableness of fees. *Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1521–22 (Fed. Cir. 1993); *see also Hines v. Sec'y of Health & Hum. Servs.*, 22 Cl. Ct. 750, 753 (1991) ("[T]he reviewing court must grant the special master wide latitude in determining the reasonableness of both attorneys' fees and costs."). Applications for attorneys' fees must include contemporaneous and specific billing records that indicate the work performed and the number of hours spent on said work. *See Savin v. Sec'y of Health & Hum. Servs.*, 85 Fed. Cl. 313, 316–18 (2008). Such applications, however, should not include hours that are "'excessive, redundant, or otherwise unnecessary.'" *Saxton*, 3 F.3d at 1521 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)).

Reasonable hourly rates are determined by looking at the "prevailing market rate" in the relevant community. *See Blum*, 465 U.S. at 895. The "prevailing market rate" is akin to the rate "in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.* at 895, n.11. Petitioners bear the burden of providing adequate evidence to prove that the requested hourly rate is reasonable. *Id.*

### a.  Hourly Rates

The decision in *McCulloch* provides a framework for consideration of appropriate ranges for attorneys' fees based upon the experience of the practicing attorney. *McCulloch v. Sec'y of Health & Human Servs.*, No. 09-293V, 2015 WL 5634323, at *19 (Fed. Cl. Spec. Mstr. Sept. 1, 2015), *motion for recons. denied*, 2015 WL 6181910 (Fed. Cl. Spec. Mstr. Sept. 21, 2015). The Court has since updated the *McCulloch* rates, and the Attorneys' Forum Hourly Rate Fee Schedules can be accessed online.[11]

Petitioner requests the following rates for the work of her counsel: for Mr. Blumenstiel, $350.00 per hour for work performed from 2019 to 2024. Petitioner also requests a rate of $120.00 per hour for the work of her counsel's paralegals from 2019 to 2024.

I find the paralegal rates reasonable and will award those in full. A reduction, however, is necessary for Mr. Blumenstiel's rates. He has previously been awarded (and billed at) $225.00 per hour for work performed from 2019 to 2022. *See, e.g.*, *Duncan v. Sec'y of Health & Hum. Servs.*, No. 16-1367V, 2022 WL 4494273 (Fed. Cl. Spec. Mstr. Sept. 7, 2022); *Howie v. Sec'y of Health & Hum. Servs.*, No. 16-1575V, 2022 WL 1553044 (Fed. Cl. Spec. Mstr. Apr. 22, 2022); *Bailey v. Sec'y of Health & Hum. Servs.*, No. 15-1417V, 2021 WL 4270225 (Fed. Cl. Spec. Mstr. Aug. 18, 2021). Mr. Blumstiel was awarded a rate of $275.00 per hour for work performed in 2023 and 2024. *Kindberg v. Sec'y of Health & Hum. Servs.*, No. 21-1940V, 2025 WL 1011675 (Fed. Cl. Spec. Mstr. Jan. 22, 2025). Accordingly, I will award the previously awarded rates. This results in a reduction of $1,717.50.[12]

---

[11] The OSM Fee Schedules are available at: http://www.cofc.uscourts.gov/node/2914. The hourly rates contained within the schedules are updated from the decision in *McCulloch*, 2015 WL 5634323.

[12] (($350.00 x 12.3 hours) – ($225.00 x 12.3 hours)) + (($350.00 x 2.4 hours) – ($275.00 x 2.4 hours)) = $1,717.50.

### b.  Reasonable Number of Hours

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary." *Saxton*, 3 F.3d at 1521 (quoting *Hensley*, 461 U.S. at 434). It is well-established that billing for administrative or clerical tasks is not permitted in the Vaccine Program. *See e.g.*, *Rochester v. United States*, 18 Cl. Ct. 379, 387 (1989) (stating that services that are "primarily of a secretarial or clerical nature . . . should be considered as normal overhead office costs included within the attorneys' fee rates"); *see also Isom v. Sec'y of Health & Hum. Servs.*, No. 94-770, 2001 WL 101459, at *2 (Fed. Cl. Spec. Mstr. Jan. 17, 2001) (agreeing with Respondent that tasks such as filing and photocopying are subsumed under overhead expenses); *Walters v. Sec'y of Health & Hum. Servs.*, No. 15-1380V, 2022 WL 1077311, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2022) (failing to award fees for the review of CM/ECF notifications and the organization of the file); *McCulloch*, 2015 WL 5634323, at *26 (noting that clerical and secretarial tasks should not be billed at all, regardless of who performs them).

Upon review of the submitted billing records, I find the time billed to be accurately representative of and consistent with the types of tasks that are typically awarded in the Program. However, for the reasons explained, I find a percentage reduction necessary.[13] First, there are multiple billing entries for non-compensable, administrative tasks such as updating the OneDrive, making a checklist, managing data/files, assigning tasks to other people, converting and splitting PDFs, looking for a case number, calendaring deadlines, sorting medical records, faxing and scanning documents, searching for a document, and filing/docketing documents. Further, some of these administrative tasks are included in block billing with other compensable tasks. Therefore, it is impossible to tell how much time was spent on the non-compensable versus compensable tasks. Additionally, there are entries for on-job "training."[14] Pet'r's Mot. at 26, 27. Next, there are entries for items unrelated to this case. For example, "[p]erusing a research Podcast at the Autism Science Foundation," and "[r]eviewed and revised Patty Black's affidavit." *Id.* at 20, 21. This case is not about autism and there is no one by the name of Patty Black involved in this case. Further, there are entries related to the administration of Mr. Honeycutt's estate.

Accordingly, I will reduce the remaining attorneys' fees by 20%. Therefore, Petitioner is entitled to final attorneys' fees in the amount of $12,044.40.[15]

---

[13] In reducing an award of fees, the goal is to achieve rough justice, and therefore a special master may take into account their overall sense of a case and may use estimates when reducing an award. *See Florence v. Sec'y of Health & Hum. Servs.*, No. 15-255V, 2016 WL 6459592, at *5 (Fed. Cl. Spec. Mstr. Oct. 6, 2016) (citing *Fox v. Vice*, 563 U.S. 826, 838 (2011)).

[14] For example, one entry is for "[p]rovided training on how to review medical records." Pet'r's Mot. at 26.

[15] $45,143.00 - $28,370.00 - $1,717.50 = $15,055.50 x 20% = $3,011.10. $15,055.50 - $3,011.10 = $12,044.40.

16

### c.    Costs

Like attorneys' fees, a request for reimbursement of attorneys' costs must be reasonable. *Perreira*, 27 Fed. Cl. at 34. Petitioner requests $5,550.00 in costs incurred by counsel, including an expert retainer fee from Dr. Marks and the filing fee. I have reviewed the requested costs and find them to be largely reasonable. While I found there was no reasonable basis beyond August 22, 2022, and Dr. Marks was enlisted to review the case after that, although he did not complete an expert report, it was his review of the medical records and inability to provide a report that ultimately led counsel to the decision to dismiss this case.[16] Therefore, his retainer should be paid. Accordingly, I will award the costs requested in full.

### VII.    Conclusion

In accordance with the Vaccine Act, 42 U.S.C. §15(e) (2018), I have reviewed the billing records and costs in this case and finds that Petitioner's request for fees and costs is reasonable. Based on the above analysis, I find that it is reasonable to compensate Petitioner and her counsel as follows:

| | |
|---|---|
| Attorneys' Fees Requested | $45,143.00 |
| (Reduction to Fees) | $33,098.60 |
| **Attorneys' Fees Awarded** | **$12,044.40** |
| | |
| Attorneys' Costs Requested | $5,550.00 |
| (Reduction of Costs) | $0.00 |
| **Attorneys' Costs Awarded** | **$5,550.00** |
| | |
| **Attorneys' Fees and Costs** | **$17,594.40** |

**Accordingly, I award a lump sum in the amount of $17,594.40, representing reimbursement for Petitioner's attorneys' fees and costs, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement.**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court **SHALL ENTER JUDGMENT** in accordance with the terms of the above Decision.[17]

**IT IS SO ORDERED.**

s/Herbrina D. S. Young
Herbrina D. S. Young
Special Master

---

[16] Despite this finding, I still find it inappropriate to award counsel's fees for work performed retaining and communicating with Dr. Marks for the reasons described above.

[17] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of a notice renouncing the right to seek review.